UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:15CR97JAR (SPM) |
| | ) | |
| CRAIG KENDALL GIBONEY, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

In accordance with the Memorandum filed herein,

**IT IS HEREBY RECOMMENDED** that Defendant's *pro se* motion to dismiss the indictment (Doc. 46) and motions to suppress evidence and statements (Doc. Nos. 85 &86) be **DENIED.**

**IT IS FURTHER RECOMMENDED** that the Government's motion for pretrial determination of admissibility of statements (Doc. 68) be **GRANTED.**

The parties are advised that they have **fourteen (14)** days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Trial in this case has been set on  **April 11, 2016,** at **9:00 A.M.** before the

Honorable John A. Ross.

SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 18th day of February, 2016.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:15CR97 JAR(SPM) |
| | ) | |
| CRAIG KENDALL GIBONEY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM**

This matter is before the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b). On February 27, 2015, Defendant Craig Kendall Giboney was arrested pursuant to a Complaint in which he was charged with receipt of child pornography. Giboney was subsequently indicted and charged with receipt (Count 1) and possession (Count 2) of child pornography. Giboney filed a *pro se* motion to dismiss for lack of subject-matter jurisdiction (Doc. 46) and, through counsel, filed motions to suppress evidence and statements (Doc. 85 and 86). The United States filed a motion for pretrial determination of the admissibility of Defendant's statements (Doc. 68).

On December 9, 2015, this Court held an evidentiary hearing on the pending pretrial motions at which Defendant was represented by attorney Talmage Newton and the United States was represented by Assistant United States Attorney, Erin Granger. At the request of the parties, the undersigned granted additional time for the filing of post-hearing briefs.

On January 13, 2016, a federal grand jury returned a superseding indictment charging Giboney with receipt and possession of child pornography and the additional offense of transporting child pornography (Count 1). Following an arraignment on the superseding indictment, on January 29, 2016, with leave of the Court, Giboney filed a written notice adopting

each of his previously filed pretrial motions. (Doc. 105). On February 1, 2016, with leave of Court, the United States filed its response to the same. The matter is now ready for a ruling. [1]

After reviewing the parties' submissions, the transcript of the evidentiary hearing, and the record as a whole, I make the following findings of fact and conclusions of law.

A. **Factual Findings**

Special Agent Kevin Matthews has been a Special Agent with the FBI for ten years. For the past six and a half years he has been assigned to the Innocent Images Unit in Woodbridge, New Jersey. Innocent Images is a unit that investigates crimes on the Internet including production, distribution, receipt, and possession of child pornography.   His training and undercover work, which is extensive, has included undercover operations involving the use of peer-to-peer programs such as GigaTribe.

GigaTribe is a peer-to-peer file sharing program that allows different computer users to trade videos, images, and music files over the internet from one computer to the other. Not unlike social media sites like Facebook, GigaTribe allows a user to create a private or closed network which the user controls by giving the user the ability to invite "friends" to join his network and/or to remove "friends" from his network. Once an invitation is sent and accepted, the "friend" becomes part of the user's network. The "friend" is then able to share files with the user, provided that both the "friend" and user are online at the same time. GigaTribe permits each user to password protect files. Files in a password-protected folder are accessible to a user's

---

1 Although this Court does not typically consider, and is under no obligation to consider, a *pro se* motion filed by a represented party, *see United States v. Pate,* 754 F.3d 550, 553 (8th Cir. 2014) (explaining that the "district court has no obligation to entertain pro se motions filed by a represented party"), an exception is warranted in this case. More specifically, the record in this case makes clear that Giboney's current and prior counsel were aware of the jurisdictional argument Giboney is pressing and neither believed they could raise those arguments in good faith. As discussed at length on the record at the time of the evidentiary hearing and again at the arraignment on the superseding indictment, United States District Judge John A. Ross granted Giboney leave to preserve his jurisdictional argument for purposes of any appeal.

"friends" only if the user gives the friend the password. Any user of GigaTribe can set up a "tribe" of GigaTribe users to share things or find other users that have similar interests. This allows the user to identify other users with similar interests and then invite them to be friends on the user's private network.

### 1.  Agent Matthews' Online Undercover Activities as "AFK1344"

In November 2014, Agent Matthews went online as GigaTribe user "AFK1344" as part of an investigation into individuals using the GigaTribe network to distribute child pornography. While online as AFK1344, he observed a tribe named "Boys4More" which included Jizzlobber11 as a tribe member. AFK1344 invited Jizzlobber11 and other Boys4More tribe members to join his network. Jizzlobber11 eventually accepted the invitation. Once Jizzlobber11 accepted the invitation, Agent Matthews could see that Jizzlobber11 had several folders for sharing that bore titles typical of files containing child pornography. Although Agent Matthews could see the titles of the files, the contents of the files were password protected. As such, Agent Matthews could not see the contents of the actual folders.

Posing as AFK1344, Agent Matthews sent Jizzlobber11 a request for his password. Jizzlobber11 did not respond to the request until the afternoon of January 8, 2015. Once he had the password, Agent Matthews was able to see that Jizzlobber11's files included a few thumbnail images of children engaged in sexual acts or a lascivious display of their genitals. Agent Matthews also saw videos bearing titles suggestive of child pornography. Agent Matthews planned to download one of the videos from Jizzlobber11; but, Jizzlobber11 changed the password before he was able to do so thereby preventing Agent Matthews from having further access to the files.

### 2.  *Agent Matthews' Online Undercover Activities as "Pedocchio"*

On the morning of January 8, 2015, Agent Matthews was running a separate undercover operation related to GigaTribe in which he used the GigaTribe account/profile "Pedocchio" – an undercover account he had maintained for several years.   His attention was drawn to a tribe called "Boytoys." The tribe Boytoys had 551 members and was self-described as a tribe "[a]ll about the boys, young vids, pics, BIBCAMs."[2] Jizzlobber11 happened to be one of the 551 members of Boytoys. Later in the day on January 8th, Jizzlobber11 accepted Pedochhio's invitation, thereby giving Peddochio the ability to access any of Jizzlobber11's files that were not password protected.

When Agent Matthews invited Jizzlobber11 and other members of Boytoys to join his Pedocchio network on January 8th, he apparently did not realize that he had previously invited Jizzlobber11 (along with other members of the Boys4More tribe) to join his AFK1344 network in November 2014. On January 8th, Agent Matthews invited Jizzlobber11 to join his Pedocchio network several hours ***before*** Agent Matthews, posing as AFK1344, asked Jizzlobber11 for his password. While it is not entirely clear whether Agent Matthews, as Pedocchio, ultimately recognized Jizzlobber11 as the same user he interacted with as AFK1344 in November 2014, what is clear is that, while posing as Pedocchio on the morning of January 8th, Agent Matthews identified Jizzlobber11 as a user whose folders could contain child pornography. He did so based on Jizzlobber11's profile and the names of his folders. Specifically, Jizzlobber11's profile described the user as a sixteen year old "who loves bo[y]s."[3]  The profile further explained "[i]f you're 14 and under and want to cam for me, I'll let you download all the vids you want."[4]

---

2 *See* Govt. Exh. 9. Agent Matthews testified that "BIB" stands for "boys in bedroom" and "BIBCAM" typically indicates webcam videos of young boys.
3 *See* Govt. Exh. 10.
4  *See id.*

On January 20, 2015, Agent Matthews was again online as Pedocchio and observed that Jizzlobber11 was online. At that point, Pedocchio could see that Jizzlobber11 was sharing several folders with names such as "BIBCAM", "MB", "V-Cam", "Webcam", and "Ten year old does XXX" – which Agent Matthews believed were indicative of child pornography. The folders were not password protected; as such, Agent Matthews downloaded 73 files directly from Jizzlobber11 by simply double-clicking on each folder. These files contained images depicting minor children engaged in a lascivious display of their genitals or involved in sexual acts.

Agent Matthews was able to determine that the internet protocol address ("IP address") of Jizzlobber11 was 99.157.254.6. After further investigation, Agent Matthews determined that the IP address was registered to a user residing at 1 Willowbrook Court, St. Charles, Missouri. Because the address was out of his district, Agent Matthews prepared a "lead" report, which included a disk with the files downloaded from Jizzlobber11's account, and sent it to law enforcement in St. Louis, Missouri. Detective Jacob Walk, an FBI Task Force Officer, was assigned to follow up on the information provided by Agent Matthews.

### 3. *Search and Audio Interview of Giboney at the Residence*

Detective Walk is a thirteen year veteran detective of Franklin County, Missouri. At the time of the evidentiary hearing, and for the three years preceding the hearing, he was detached to the Missouri Internet Crimes Against Children ("ICAC") Task Force and the FBI Child Exploitation Task Force. In February 2015, Missouri ICAC received a lead from the FBI in New Jersey and Detective Walk was assigned to the case. The lead included a report and child pornography files downloaded from IP address 99.157.254.6. After conducting his own investigation to confirm information contained in the report, Detective Walk used the information from Agent Matthews to prepare an affidavit for a search warrant of Giboney's residence.

~ 5 ~

On February 26, 2015, the search warrant was issued and, that same day, six officers, including Detective Walk, arrived at the residence to execute the search warrant. Only one police officer was in uniform. All other officers, including Detective Walk, were dressed in plain clothes. When the officers arrived at the residence, Detective Walk knocked on the door and advised the woman who answered that they had a search warrant. After entering the residence the officers were advised that there was an individual sleeping in the basement.

Detective Walk and two other officers went down to the basement. The lights were off and it was dark so the officers drew their guns for protection and used their flashlight. They found Giboney sleeping on a couch in the basement. While in the basement, Detective Walk observed a laptop computer on a table in front of the couch where Giboney had been sleeping. The officers turned on the lights in the basement, asked Giboney to show his hands, and then escorted him upstairs where he was directed to join the other occupants in the garage so the officers could finish clearing the house.

After the officers cleared the house, Detective Walk began interviewing the occupants. Detective Walk conducted a recorded interview of Giboney in the living room of the residence. During the interview, Detective Walk advised Giboney that he was not under arrest and was free to leave. Giboney agreed to speak with Detective Walk and the interview took place in the living room. Giboney was not physically restrained and there was no weapon drawn. For most of the interview, Detective Walk was the only officer questioning Giboney. The other officers were in different locations within the residence performing different tasks. At various points during the interview, Giboney made requests to get a shirt, use the bathroom, and go outside for a smoke. Although Detective Walk advised Giboney that he could not wander freely throughout the house while they were executing the search warrant, all of Giboney's requests were honored.

~ 6 ~

While Detective Walk was interviewing Giboney, officers seized and gained access to the laptop computer that was in the basement where Giboney had been sleeping. Detective Walk learned from another officer (Sergeant Bosley) that the internal IP address for the laptop in the basement matched information the officers were receiving from the GigaTribe network. This suggested to Detective Walk that the computer in the basement was the computer that had been using the GigaTribe network. At that point, Detective Walk was prepared to *Mirandize* Giboney but, before he could do so, Giboney asked to use the restroom.

After he used the restroom, Giboney then indicated he wanted to go outside to smoke. Once Giboney and Detective Walk were in the garage, Detective Walk confirmed that Giboney was still willing to talk to him then advised Giboney that he first wanted to read Giboney his rights. When Giboney asked why Detective Walk wanted to read him his rights, Detective Walk advised that he had developed some information and wanted to read him his rights before he asked any more questions. At that point, Giboney stated that if Detective Walk was planning to arrest him, he was "going to take off" and Detective Walk would have to "come get [him], man."[5] Giboney then took off walking down the street. Detective Walk, accompanied by two other officers, then followed Giboney and took him into custody after informing him that he was under arrest. Detective Walk placed Giboney into a police car and transported him to a police station. While in the car, Giboney continued to converse freely with Detective Walk; however, Detective Walk did not question Giboney further about the laptop or the investigation.

### 4. *Video Recorded Interview of Defendant at the Police Station*

At the police station, Detective Walk conducted a video recorded interview of Giboney. The interview began with Detective Walk reading Giboney his *Miranda* rights from a form entitled "Your Constitutional Rights." Giboney initialed each right after Detective Walk read the

---

5 *See* Govt. Exh. 3, at p. 22.

right to him out loud. Giboney also verbally acknowledged each time that he understood. As Detective Walk was going over Giboney's rights, Giboney jokingly asked "does it stop now if I want to get an attorney?"[6]  Detective Walk responded "if at any time you want to stop, man, just tell me and we'll stop."[7]

Detective Walk then asked Giboney to read the section of the form entitled "Waiver" out loud. Giboney complied with the request but stated he did not want to initial the waiver. Giboney explained that he did not want to initial the waiver because the form stated "I do not want a lawyer at this time" when he did, in fact, want a lawyer.[8]  Seeking clarification, Detective Walk asked, "[A]re you saying you don't want to talk to me without an attorney?" Giboney responded "[T]hat's not what I'm saying." Giboney further explained "I do want an attorney if I'm going to be charged with this."[9]  Walk, seeking further clarification, asked "So you want an attorney with you during questioning here. Is that what you're saying?" and "[A]re you saying you want a lawyer *at this time*?"[10]  Giboney then responded, "Oh, *at this time*. Alright . . . Sorry." He then initialed the waiver section of the form.[11]  Detective Walk then asked Giboney, "[W]ith this waiver in mind, do you want to talk to me?" Giboney replied "I'll talk to you."[12]

A. ***Pro Se* Motion to Dismiss the Indictment (Doc. 46)**.

Giboney contends this Court lacks jurisdiction because the images and videos of child pornography at issue did not physically cross state lines; Congress does not have the power under the Commerce Clause to punish those who possess child pornography when the pornography has not crossed state lines; and the fact that Giboney's computer hard drive may have crossed state

---

6  *See* Govt. Exh. 5B, at p. 3; Govt. Exh. 4, at 9:06-9:13.
7  *Id.*
8  *See* Govt. Exhs. 4, at 10:30-10:34; 5B, at p. 4.
9  See *Id.*
10  *See* Govt. Exhs. 4, at 11:05-11:17 (emphasis in original) & 5B, at p. 4-5.
11  *See Id. See also* Govt. Exh. 6.
12  *See* Govt. Exhs. 4, at 11:25-11:30 & 5B, at p. 5.

lines is insufficient to trigger federal jurisdiction. Giboney relies on Supreme Court precedent such as *United States v. Lopez,* 514 U.S. 549 (1995) and *United States v. Morrison,* 529 U.S. 598 (2000) in support of his arguments.

Giboney does not dispute the assertion in the superseding indictment that he transported and received graphic files over the internet. Rather, he contends that assertion is insufficient to satisfy the interstate commerce element of the offenses charged. However, nearly every court that has considered the issue has held that because the internet is an international network of interconnected computers, the interstate commerce element of §§2252A(a)(1) (transportation) and (a)(2) (receipt) is satisfied by evidence that the image was transmitted via the internet. See *United States v. Mellies,* 329 Fed. Appx. 592, 606 (6th Cir. 2009) (citing cases that stand for the proposition that use of the internet satisfies the interstate commerce element of the federal law prohibiting receipt of child pornography); *United States v. MacEwan*, 445 F.3d 237, 243-44 (3rd Cir. 2006) (holding that the internet is an instrumentality and channel of interstate commerce; thus transmission of photographs by means of the internet is tantamount to moving photographs across state lines); *United States v. Runyan,* 290 F.3d 223, 239 (5th Cir. 2002) (same); *United States v. Hilton,* 257 F.3d 50, 54 (1st Cir. 2001) (holding that "proof of transmission of pornography over the Internet or over telephone lines satisfies the interstate commerce element of the offense"). Giboney has offered no case law or other authority that warrants reaching a different conclusion in this case.

Giboney's argument that Congress lacks the power under the Commerce Clause to punish those who possess child pornography that has not crossed state lines is also unavailing. The Supreme Court examined the limits of Congress' Commerce Clause authority in *Gonzales v. Raich*, 545 U.S. 1 (2005), a case involving the Controlled Substances Act ("CSA"). The Supreme Court held that the Commerce Clause permits regulation of "purely local activities that are a part

~ 9 ~

of an economic 'class of activities' that have a substantial effect on interstate commerce." *Raich,* 545 U.S. at 17. The Eleventh Circuit subsequently applied *Raich* when addressing a constitutional challenge to §2252A of the Child Pornography Prevention Act (CPPA) in *United States v. Maxwell,* 446 F.3d 1210 (11th Cir. 2006). The Eleventh Circuit held *Raich* was applicable because, like the CSA, the CPPA is "part of a comprehensive regulatory scheme criminalizing the receipt, distribution, sale, production, possession, solicitation and advertisement of child pornography" -- a "highly organized, multimillion dollar industry that operates on a nationwide scale." *Id.* at 1216-17. In concluding that §2252A is a valid exercise of Congress's Commerce Clause authority, the Eleventh Circuit held that "where Congress has attempted to regulate (or eliminate) an interstate market, *Raich* grants Congress substantial leeway to regulate purely intrastate activity (whether economic or not) that it deems to have the capability, in the aggregate, of frustrating the broader regulation of interstate economic activity." *Id.* at 1215. *See also United States v. Parton,* 749 F.3d 1329, (11th Cir. 2014) (reaffirming *Maxwell* in the wake of *National Federation of Independent Business v. Sebelius,* ––– U.S. ––––, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012)).

Other circuits that have considered the question post-*Raich* have applied the reasoning from *Raich* to similarly conclude that §2252A is a valid exercise of Congress's Commerce Clause authority. *See, e.g., United States v. Sullivan,* 451 F.3d 884, 890-91 (D.C. Cir. 2006) (holding a rational basis exists for believing that failure to regulate the possession of child pornography that has been "transported in interstate or foreign commerce  . . . by computer" would leave a 'significant gap in Congress' comprehensive efforts to eliminate the market for sexually exploitative uses of children" and that application of 2252A "might ensnare some purely intrastate activity is of no moment"); *United States v. Forrest,* 429 F.3d 73, 78 (4th Cir. 2005) (holding under *Raich,* there was a rational basis for Congress to determine that the local production and possession of child pornography substantially affect interstate commerce).

~ 10 ~

Although the Eighth Circuit has not explicitly adopted the reasoning from *Raich,* in *United States v. Mugan,* the Eighth Circuit rejected a constitutional challenge to §2251 using a rationale that is virtually indistinguishable from that in *Raich* and its CPPA progeny:

> [O]ur sister circuits considered all of the *Morrison* factors, including the realities of the marketplace, and it makes sense for us also to look beyond the jurisdictional nexus element in analyzing the effects on interstate commerce. The extent of the interstate market for child pornography described by Congress and its dependence upon locally produced materials demonstrate that the intrastate production and possession of child pornography is an economic activity connected to interstate commerce. The congressional findings underlying the child pornography statute at issue in the case before the court distinguish it from *Lopez* where there were no findings tying the statute to interstate commerce, and from *Morrison,* where there were only general findings showing no more than an attenuated effect on interstate commerce. Moreover, unlike the possession of guns in school zones in *Lopez,* and the gender related violence in *Morrison,* the intrastate production of child pornography is an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.

*Mugan,* 441 F.3d 622, 629-30 (8th Cir. 2006) (internal quotations and citations omitted).

The foregoing authorities make clear that, even if Giboney's charges arise exclusively from intrastate conduct, Congress's Commerce Clause authority reaches that conduct because, in passing the CPPA, Congress demonstrated that "the intrastate production and possession of child pornography is an economic activity connected to interstate commerce."  *Id. at 629.*

Giboney's final argument -- the fact that his computer hard drive crossed state lines is insufficient to confer jurisdiction on this Court -- also fails. It is well established by binding Eighth Circuit precedent that Congress has the authority under the Commerce Clause to prohibit the possession of child pornography based on the fact that images and videos of child pornography are contained on an item such as a computer hard drive, camera, or other material

~ 11 ~

that has traveled in interstate or foreign commerce. *See United States v. McCloud*, 590 F.3d 560, 568 (8th Cir. 2009); *United States v. Fadl*, 498 F.3d 862, 866 (8th Cir. 2007), *Mugan*, 441 F.3d at 630; *United States v. Hampton*, 260 F.3d 832 (8th Cir. 2001); *United States v. Bausch,* 140 F.3d 739, 740 (8th Cir. 1998); *United States v. Hoggard*, 254 F.3d 744, 746 (8th Cir. 2001).

For all of the foregoing reasons, Defendant's *pro se* motion to dismiss the superseding indictment should be denied.

**B.  Motion to Suppress Evidence (Doc. 85).**

Giboney contends Agent Matthews violated his Fourth Amendment rights by conducting a warrantless search of Giboney's private property when he downloaded files from Giboney's computer. Giboney contends that the files and all other fruit of the warrantless search, including the evidence seized from his residence, should be suppressed. The United States counters that there was no Fourth Amendment violation because the files it intends to introduce at trial were files Defendant made accessible for file-sharing with any other user on a computer network.

The Fourth Amendment protects individuals against "unreasonable searches and seizures" by the government. U.S. CONST. amend. IV. The government conducts a search for purposes of the Fourth Amendment by intruding onto private property for the purpose of obtaining information or by invading a person's privacy. *See Florida v. Jardines,* 133 S. Ct. 1409, 1414 (2013) (officer conducted a search for Fourth Amendment purposes by using a drug-sniffing dog on front porch of a home because police intruded onto defendant's property for purpose of obtaining information about whether drugs were in the house); *United States v. Jones*, 132 S. Ct. 945, 950 (2012) (search when officers attached GPS device to vehicle exterior because police intruded onto defendant's property for purpose of obtaining information about whether drugs were in the house).

A defendant seeking to suppress evidence from a search must demonstrate that he had a "legitimate expectation of privacy" in the place searched. *Smith v. Maryland*, 442 U.S. 735,

743-44 (1979). An individual does not have a legitimate expectation of privacy in items or areas that are exposed to the public, abandoned, or accessed by consent. *See Katz v. United States,* 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."). Courts, including the Eighth Circuit, have consistently held that a defendant who shares files on a computer network (even a closed network) has no legitimate expectation of privacy in the shared files. *See United States v. Stults*, 575 F.3d 834, 840 (8th Cir. 2009) (defendant could not "invoke the protections of the Fourth Amendment" where he installed a file-sharing software on this computer that makes his files accessible to others for file sharing because there is no expectation of privacy in those files that society is prepared to accept as reasonable); *United States v. Borowy*, 595 F.3d 1045 (9th Cir. 2010) (holding that an individual's subjective intention not to share his files did not create an objectively reasonable expectation of privacy where defendant was aware that he was using a file-sharing program that would allow the public at large to access files in his shared folder unless he took steps to avoid it); *United States v. Sawyer*, 786 F. Supp. 2d 1352, 1356 (N.D. Ohio 2011) (holding that an individual does not have an objectively reasonable expectation of privacy in information that he shared over GigaTribe; even though it is a "closed" peer-to-peer file sharing program; once defendant grants "friends" access to his files in a "closed" network defendant has no control over the manner in which his friends use that access); *United States v. Soderholm*, 2011 WL 5444053 1, 7 (D. Neb. 2011) (holding "defendant did not have an objectively reasonable expectation of privacy in the files stored on his computer once he designated those files for sharing with the 'friends' on his private network."); and *United States v. Ladeau*, 2010 WL 1427523 1 (D. Mass 2010) (holding that once an individual turned over information to a third party about how to access his GigaTribe network, his expectation of privacy became objectively unreasonable).

~ 13 ~

As the foregoing factual findings demonstrate, in this case, Agent Matthews gained access to Giboney's files as "Pedocchio," a GigaTribe user whose invitation to join a private network controlled by Pedocchio was accepted by "Jizzlobber11." But, even before Jizzlobber11 accepted Pedocchio's invitation to join his private network, as a GigaTribe user, Agent Matthews was able to see Jizzlobber11's profile and the titles, but not the contents, of his folders. Based on Jizzlobber11's profile and folder titles, Agent Matthews identified Jizzlobber11 as a user whose folders could contain child pornography. Once Jizzlobber11 accepted Pedocchio as a friend, Peddochio was able to access the contents of any of Jizzlobber11's files that were not password protected. The 73 files that were ultimately downloaded by Agent Matthews and that formed the basis of the search warrant in this case were not password protected on January 20th when both Agent Matthews and Jizzlobber11 were online. As such, Pedocchio was free to download the files that formed the basis for the search warrant that was ultimately executed on Giboney's residence.

Because Defendant had no legitimate expectation of privacy in the files he voluntarily shared with Agent Matthews, his motion to suppress should be denied.

C. **Motion to Suppress Statements (Doc. 86) &**
   **Motion for Pretrial Determination of Admissibility of Statements (Doc. 68)**

   *1. The Pre-Arrest Interview of Giboney Did Not Violate His Fifth Amendment Rights.*

Giboney contends his pre-arrest statements should be suppressed because Detective Walk extracted those statements without advising Giboney of his *Miranda* rights. Generally, *Miranda* warnings must be given when a person is interrogated after being taken into custody. *United States v. Huether*, 673 F.3d 789, 794 (8th Cir. 2012). Here, based on the foregoing factual findings, there is no question that Giboney was interrogated at his residence. The only question is whether the interrogation was custodial.

~ 14 ~

A defendant is in custody for purposes of *Miranda* when there is a "'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' The 'only relevant inquiry' in considering that question is how a reasonable person in [the suspect's] position would have understood the situation." *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004) (citations omitted); *United States v. Perrin*, 659 F.3d 718, 719 (8th Cir. 2011); *see also United States v. Muhlenbruch*, 634 F.3d 987, 995-96 (8th Cir. 2011).

The Eighth Circuit has identified several non-exclusive factors that a court can consider to determine if someone is in custody for the purposes of *Miranda* in *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). *See also Huether*, 673 F.3d at 794. The factors are a "rubric for considering the ultimate issue, not a mandatory checklist." *Perrin*, 659 F.3d at 719. The factors to be examined by the court, without consideration of the participants' subjective views, are as follows:

> (1) whether the suspect was informed that he was free to leave and that answering was voluntary;
> (2) whether the suspect possessed freedom of movement;
> (3) whether the suspect initiated contact or voluntarily acquiesced;
> (4) whether strong arm tactics or strategies were employed;
> (5) whether the atmosphere was police dominated; or,
> (6) whether the suspect was placed under arrest at the end of questioning.

*Huether*, 673 F.3d at 794.   "The first three . . . factors . . . if present, mitigate against the existence of custody . . . the last three . . . are aggravating factors which, if present, aggravate the existence of custody." *Huether*, 673 F.3d at 794 (citations omitted).

Applying the foregoing principles to the factual findings in this case demonstrates that Giboney was not in custody at the time of his pre-arrest interview. Detective Walk advised Giboney that he was free to leave and that answering was voluntary and Giboney indicated that he was willing to talk to Detective Walk. Although Detective Walk advised Giboney that he was not free to roam about the house while the officers were executing the search warrant, Giboney

~ 15 ~

was not physically restrained during the interview; he requested and was provided a shirt; he went to the restroom when he needed to; and he was permitted to go outside to smoke. Although several officers accompanied Detective Walk in executing the search warrant, the pre-arrest interview of Giboney was conducted exclusively by Detective Walk while the other officers were in other parts of the residence performing different tasks.

Given the totality of the circumstances, a reasonable person in Giboney's position would have understood that he was not in custody. In fact, Giboney's words and conduct clearly show he did not believe he was not under arrest during his pre-arrest interview. When Detective Walk indicated that he needed to advise Giboney of his rights because he had developed some information during the search, Giboney stated that if Detective Walk was planning to arrest him, he was "going to take off" and Detective Walk would have to "come get [him]."[13]  Giboney then took off walking down the street.

Because the pre-arrest interview of Giboney was not a custodial interrogation, Detective Walk was not required to advise Giboney of his *Miranda* rights. As such, Giboney's motion to suppress his pre-arrest statements should be denied, and the United States' motion for pretrial determination of the admissibility of those pre-arrest statements should be granted.

### 2. *The Post-Arrest Interview of Giboney Was Voluntary and Did Not Violate His Fifth Amendment Rights*

Giboney contends his post-arrest statement should be suppressed because it was the product of coercion and duress and, therefore, was provided involuntarily. Giboney also suggests the post-arrest interview continued after he invoked his Fifth Amendment right to counsel. It is well-established that the Fifth Amendment privilege against self-incrimination can be waived. *Maryland v. Shatzer*, 559 U.S. 98, 104 (2010). The standard for determining the voluntariness of

---

13 *See* Govt. Exh. 3, at p. 22.

either a waiver of *Miranda* rights and/or a statement is the same. *Colorado v. Connelly,* 479 U.S. 157, 169-70 (1986). "A statement [or a waiver] is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *United States v. Boslau,* 632 F.3d 422, 428 (8th Cir. 2011) (quoting *United States v. LeBrun,* 363 F.3d 715, 724 (8th Cir. 2004)). This determination must be made by looking at the totality of the circumstances, including both "the conduct of the officers and the characteristics of the accused." *LeBrun,* 363 F.3d at 724. Factors include, among other things, "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." *Boslau,* 632 F.3d at 428 (quoting *Sheets v. Butera,* 389 F.3d 772, 779 (8th Cir. 2004)).

Although "[t]he government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were voluntary," *LeBrun,* 363 F.3d at 724, "[c]ases in which a defendant can make a colorable argument that a self- incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Berkemer v. McCarthy,* 468 U.S. 420, 423 (1984). "The fact that such warnings were given weighs in favor of a voluntariness finding." *United States v. Mendoza,* 85 F.3d 1347, 1350 (8th Cir. 1996).

If a defendant clearly and unambiguously invokes his right to remain silent or his right to counsel either prior to or during interrogation, then further questioning is permissible only if law enforcement officials "scrupulously honor" the defendant's assertion of those rights. *Michigan v. Mosley,* 423 U.S. 96, 102-04 (1975) (holding that police must scrupulously honor a suspect's invocation of the right to silence); *Edwards v. Arizona,* 451 U.S. 477, 484-85 (1981) (holding that an accused who has expressed his desire to deal with police only through counsel "is not subject to further interrogation by the authorities until counsel has been made available to him,

~ 17 ~

unless the accused himself initiates further communication, exchanges, or conversations with the police").

In *Davis v. United States,* 512 U.S. 452, 459 (1994), the Supreme Court held that in order to invoke the right to counsel and, thereby cut off further questioning, "at a minimum," the defendant must make "some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." The accused must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 459. Consistent with *Davis,* the Eighth Circuit has repeatedly held that an ambiguous statement concerning counsel will not invoke that individual's right to counsel. *See e.g. Dormire v. Wilkinson*, 249 F.3d 801, 805 (8th Cir. 2001) (holding that a defendant's statement, "Could I call my lawyer?" was not an unambiguous request for counsel that would require cessation of further questioning); *United States v. Cloud*, 594 F.3d 1042, 1046 (8th Cir. 2010) (holding that when a police officer asked defendant if he wished to speak to an attorney and defendant stated "Yeah, probably" was not clear and unequivocal request for counsel requiring cessation of interview); *United States v. Kelly*, 329 F.3d 624, 630 (8th Cir. 2003) (holding that a suspect's statement, "do you know any good attorneys" was not an unequivocal request for the assistance of counsel).

Applying the factual findings to the foregoing principles, Giboney voluntarily waived his Fifth Amendment rights to counsel and to remain silent and voluntarily made a post-arrest statement to Detective Walk. Before questioning Giboney, Detective Walk read each of the *Miranda* rights out loud to Giboney. When Giboney expressed concern over initialing the consent to proceed without counsel, Detective Walk asked Giboney a series of questions aimed at clarifying whether Giboney was willing to speak to him without an attorney. Giboney's statements, body language, and intonation all made it clear that he was willing to be interviewed

~ 18 ~

by Detective Walk without a lawyer once he understood that he was not giving up any future right to be represented by an attorney. Before proceeding with the interview, Giboney initialed each right and signed the waiver of his rights.

The statements given by Giboney in the interview were also clearly voluntary. There was no evidence that the statements were the result of any threats, violence, express or implied promises, or any deception on the part of Detective Walk. Giboney presented himself as an intelligent, well-spoken individual and even commented at one point that he is "very smart." Because Giboney was clearly advised of his *Miranda* rights, clearly understood his rights, and clearly and unequivocally waived those rights prior to giving his post-arrest statement, Giboney's motion to suppress the post-arrest statement should be denied. For the same reasons, the United States' motion for pretrial determination of the admissibility of Giboney's post-arrest statement should be granted.

## CONCLUSION

For all of the foregoing reasons, Defendant's *pro se* motion to dismiss the indictment (Doc. 46) and motions to suppress evidence and statements (Doc. Nos. 85 & 86) should be denied. For all of the foregoing reasons, the United States' motion for pretrial determination of admissibility of statements (Doc. 68) should be granted.

SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated February 18, 2016.

~ 19 ~